UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| HUMANA, INC., UNITED HEALTHCARE SERVICES, INC., and AETNA INC., <br><br> Plaintiffs, <br><br> vs. <br><br> BRENT W. COON, P.C. A/K/A BRENT COON & ASSOCIATES, REAUD MORGAN & QUINN, LLP, THE BOGDAN LAW FIRM, FOSTER & SEAR, LLP, HISSEY KIENTZ, LLP, and SHRADER & ASSOCIATES, LLP, <br><br> Defendants. | Civil Action No. <br><br><br> **JURY TRIAL DEMANDED** |

## PLAINTIFFS' ORIGINAL COMPLAINT

The plaintiffs, Humana, Inc., United Healthcare Services, Inc., and Aetna Inc., file their Original Complaint complaining of and against Defendants, Brent W. Coon, P.C. a/k/a Brent Coon & Associates, Reaud, Morgan & Quinn, LLP, The Bogdan Law Firm, Foster & Sear, LLP, Hissey Kientz, LLP, and Shrader & Associates, LLP, and in support thereof allege the following:

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................................ 1

II.  PARTIES ....................................................................................................................... 4

    A.  Plaintiffs ................................................................................................................ 4

    B.  Defendants ............................................................................................................ 5

III.  JURISDICTION AND VENUE ........................................................................................ 6

IV.  FACTUAL ALLEGATIONS ............................................................................................. 7

    A.  Asbestos exposure and related claims led to the creation of asbestos trusts to compensate asbestos claimants, but the process moves slowly and does not protect the plaintiffs' rights. ....................................................................................................................... 9

        1.  Asbestos trusts typically pay pre-determined amounts for various asbestos-related diseases, but require releases purporting to waive the trust's liability for medical expenses without the consent of the plaintiffs. ................................................... 9

        2.  The claims handling process may take years. ............................................. 16

    B.  The sources and amounts of an asbestos claimant's trust recoveries is a mystery. ........... 17

    C.  The plaintiffs identified matched asbestos claimants for whose recoveries the defendant law firms are liable. .............................................................................................. 18

    D.  The plaintiffs have paid to treat the asbestos-related injuries of matched asbestos claimants. ............................................................................................................. 20

    E.  The plaintiffs are entitled to reimbursement of these funds. ............................................ 20

    F.  Medicare Advantage plans have a special right of recovery under federal law requiring reimbursement by primary plans like the tortfeasors. ..................................................... 21

V.  COUNTS OF THE COMPLAINT ...................................................................................... 24

VI.  PRAYER FOR RELIEF .................................................................................................. 33

## Glossary of Terms

| | |
|---|---|
| Asbestos claimant | An individual who is pursuing, or has in the past pursued, a recovery for injuries allegedly caused by exposure to asbestos or asbestos-containing products. The term includes individuals who are seeking recovery through the tort system, compromise or settlement, workers' compensation, the bankruptcy trust system, or a combination of these. |
| Asbestos recovery | A recovery made, by way of settlement, judgment, or otherwise, by an asbestos claimant from a tortfeasor for injuries alleged to have been caused by exposure to asbestos or an asbestos-containing product or products. |
| Asbestos trust | A trust formed pursuant to section 524(g) of the Bankruptcy Code for the purpose of assessing, resolving, and paying the asbestos-related liabilities of the debtor(s) and certain related entities. |
| Plan member | An individual who receives health benefits from one of the plaintiffs. |
| Matched asbestos claimant | An asbestos claimant represented by one of the defendant law firms who has also been identified as a plan member. |
| TDP | Trust Distribution Procedures (used by asbestos trusts in assessing, resolving, and paying asbestos claims). |
| Tortfeasor | The entity responsible for manufacturing, selling, producing, distributing, or otherwise placing into the stream of commerce the asbestos or asbestos-containing product or products that allegedly caused an asbestos claimant's injuries. The term specifically includes any asbestos trusts created to resolve the liabilities of the tortfeasor. |

# I.    INTRODUCTION

1.      A party to a contract cannot, after receiving their bargained-for benefits, take deliberate steps to frustrate the ability of the other party to realize the benefit of its bargain.  Nor may third parties actively assist a party in avoiding contractual obligations while simultaneously profiting off the breach.

2.      The plaintiffs are non-governmental insurers, sponsors, and administrators of health benefit plans.  All have provided medical benefits under these plans to treat injuries suffered by their plan members, including injuries caused by exposure to asbestos.  Pursuant to the plans, the plaintiffs have a contractual right to be reimbursed for or to recover any expenses they paid on behalf of their members in the event their members recover for their injuries from tortfeasors.  Having received the benefits of their bargain (the medical care), the plan members and the attorneys representing them are now sidestepping the burdens of that bargain (the obligation to reimburse their health plan).

3.      The defendant law firms represented the plaintiffs' plan members in recovering money from tortfeasors who caused asbestos-related injuries.  In doing so, the defendant law firms necessarily know that a portion of those recoveries rightfully and lawfully belongs to the plaintiffs.  The plaintiffs' portion of the recoveries should have been and going forward must be retained by the defendant law firms and returned to the plaintiffs.

4.      The defendant law firms have represented thousands of asbestos claimants who collectively have recovered millions of dollars from tortfeasors who caused their asbestos-related injuries.  And, the defendant law firms currently represent thousands of asbestos claimants, including the plaintiffs' plan members, who are seeking to recover for their asbestos-related injuries.

5.      Although some asbestos-related claims have been or are being pursued in the tort system (with some being resolved therein), the majority of asbestos-related claims were and are submitted to asbestos bankruptcy trusts.

6.      Unfortunately, the opacity of bankruptcy trusts prevents the plaintiffs from protecting and pursuing their subrogation and reimbursement rights.  Claims are submitted to the trusts under a cloak of secrecy.  Specifically, there is no public disclosure of who submits a claim against a trust, the plaintiffs receive no notice when claims are submitted or resolved, and there is no judicial oversight or public disclosure of the claims evaluation or resolution process. Additionally, there is no public disclosure of who gets paid, how much they get paid, and from which trust(s) they get paid.

7.      Once a trust processes and approves a claim, it pays the funds to the law firm that represents the related claimant.  After deducting its attorneys' fees, the law firm then distributes all of the remaining funds, including the funds lawfully belonging to the plaintiffs, to its client, the asbestos claimant.  Similar to the submission and resolution of the claims with the trusts, these payments are made without providing notice to the plaintiffs, which substantially impairs the plaintiffs' ability to recover the amounts that are legally owed to them.

8.      Despite the secretive nature of this system, the plaintiffs have been able to identify at least 297 matched asbestos claimants, i.e., those claimants who (1) are or were represented by at least one of the defendant law firms in seeking compensation for their asbestos-related injuries, and (2) on whose behalf the plaintiffs paid to treat the asbestos-related injuries for which they recovered. The plaintiffs have also determined that they have paid an aggregate of over $19.5 million to treat asbestos-related diseases.  This sum represents the aggregate lien amount owed to the plaintiffs by the matched asbestos claimants.

9.     The defendant law firms have long been aware of the plaintiffs' subrogation and reimbursement rights concerning asbestos claimants in general and, in some cases, specifically concerning the matched asbestos claimants they represent.  Yet these law firms have continually received specific sums of money from tortfeasors, and disbursed these funds without accounting for the plaintiffs' rights.

10.     The defendant law firms' decision to distribute the funds received (less their own fee) without protecting the plaintiffs' rights has harmed the plaintiffs and unjustly enriched both the matched asbestos claimants and the defendant law firms.  The plaintiffs bring this action to assert their rights associated with all plan members represented by the defendant law firms who have recovered money for asbestos-related injuries yet failed to honor their obligation to reimburse the plaintiffs.

11.     In this action, the plaintiffs seek all available relief, including but not limited to equitable relief under § 502(a)(3) of the Employee Retirement Income Security Act, 29 U.S.C §§ 1001-1461 (ERISA), and as Medicare Advantage providers as defined in the Balanced Budget Act of 1997, the Medicare Prescription Drug Improvement and Modernization Act of 2003, and federal regulations promulgated under those laws.

12.     The plaintiffs seek equitable relief in the form of restitution of the amounts that they paid for treatment of matched asbestos claimants' asbestos-related injuries.  The plaintiffs also seek the imposition of a constructive trust over a portion of the total asbestos recovery made by each matched asbestos claimant in an amount necessary to fully reimburse the plaintiffs for such payments.  Further, the plaintiffs seek the imposition of an equitable lien to enforce the reimbursement and subrogation terms of the plans for which they provide insurance or claims administration services.

## II.   PARTIES

### A.   Plaintiffs

13.    Plaintiff Humana, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Louisville, Kentucky.

14.    Plaintiff United HealthCare Services, Inc., including its subsidiaries and affiliates, is a corporation organized and existing under the laws of the State of Minnesota with its principal place of business in Eden Prairie, Minnesota.

15.    Plaintiff Aetna Inc. is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business in Hartford, Connecticut.

16.    The plaintiffs, who collectively provide health coverage to a substantial portion of the United States population, bring this complaint on behalf of themselves and their subsidiaries that provided health plan benefits to asbestos claimants, including matched asbestos claimants, to treat asbestos-related injuries for which they have received settlements or judgments.  All the plaintiffs offer health plans that fall into one or more of the following categories:

17.    All plaintiffs are insurers or claims administrators for "employee welfare benefit plans" as defined by 29 U.S.C. § 1002(1) of ERISA (ERISA plans), which gives the plaintiffs authority to bring actions to recover sums owed under the reimbursement provisions of these ERISA plans.  The plaintiffs provide or provided insurance to identifiable asbestos claimants, including matched asbestos claimants, under ERISA plans.

18.    All plaintiffs are qualified healthcare companies that have contracted with the Centers for Medicare and Medicaid Services (CMS) to administer Medicare benefits to Medicare beneficiaries under Parts C and D of the Medicare Act (MA plans).  The plaintiffs provide or provided insurance to identifiable asbestos claimants, including matched asbestos claimants, under MA plans.

19.     All plaintiffs are also qualified healthcare companies that have contracted with the Federal Office of Personnel Management to provide health insurance to federal employees under the Federal Employee Health Benefits Act of 1959, 5 U.S.C. § 8901 *et seq.* (FEHBA plans).  The plaintiffs provide or provided insurance to identifiable asbestos claimants, including matched asbestos claimants, under FEHBA plans.

20.     All health plans offered or administered by the plaintiffs provide the plaintiffs a contractual right to reimbursement and/or subrogation in an amount equal to all amounts the plaintiffs paid to cover asbestos-related medical expenses of their plan participants.

21.     The plaintiffs are also entitled reimbursement and/or subrogation of those amounts through the basic principles of equity.

**B.     Defendants**

22.     Defendant Brent W. Coon, P.C. a/k/a Brent Coon & Associates (Brent Coon) is a professional corporation that is incorporated under the laws of the State of Texas. Brent Coon has offices spanning the country, including hub offices in Beaumont, Texas and Houston, Texas. Brent Coon may be served with process by serving its president and director, Brent W. Coon, at 215 Orleans Street, Beaumont, Texas 77701.

23.     Defendant Reaud Morgan & Quinn, LLP (Reaud Morgan) is a limited liability partnership that exists under the laws of the State of Texas. Reaud Morgan has offices in Beaumont, Texas and Houston, Texas. Reaud Morgan may be served with process by serving Glen W. Morgan at 801 Laurel Street, Beaumont, Texas 77701.

24.     Defendant The Bogdan Law Firm (Bogdan) is a business organized and existing under the laws of the State of Texas. Bogdan's principal office is located in Stafford, Texas. Bogdan may be served with process by serving Eric Alan Von Bogdan at 4910 Wright Road, Suite 190, Stafford, Texas 77477.

25.     Defendant Foster & Sear, LLP (Foster) is a limited liability partnership that exists under the laws of the State of Texas. Foster's principal office is located in Grand Prairie, Texas. Foster may be served with process by serving Spring Foster McCurdy at 817 Greenview Drive, Grand Prairie, Texas 75050.

26.     Defendant Hissey Kientz, LLP (Hissey) is a limited liability partnership that exists under the laws of the State of Texas. Hissey's principal office is located in Austin, Texas. Hissey may be served with process by serving Michael E. "Mike" Hissey or Robert Earl Kientz at One Arboretum Plaza, 9442 Capital of Texas Highway North, Suite 400, Austin, Texas 78759.

27.     Defendant Shrader & Associates, LLP (Shrader) is a limited liability partnership that exists under the laws of the State of Texas. Shrader's principal office is located in Houston, Texas. Shrader may be served with process by serving Justin Hyde Shrader at 3900 Essex Lane, Suite 390, Houston, Texas 77027.

28.     Brent Coon, Reaud Morgan, Bogdan, Foster, Hissey, and Shrader are referred to collectively herein as the defendant law firms.

### III.     JURISDICTION AND VENUE

29.     The defendant law firms each conduct substantial business throughout the United States, including in the State of Texas.

30.     Venue is proper in this district under 29 U.S.C. § 1132(e)(2) because one or more of the plaintiffs' ERISA plans is administered in this district, and process may be served in any district where a defendant resides or may be found.

31.     Venue is also proper in this district under 28 U.S.C. § 1391 because each defendant law firm "resides" in this district, is subject to personal jurisdiction in this district, and a substantial portion of the events giving rise to the plaintiffs' claims involve settlements reached with, and payments made to, residents of the State of Texas.

32.     This Court has jurisdiction over the plaintiffs' ERISA-related claims pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132.

33.     Jurisdiction is also proper pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(a)(3) because the plaintiffs seek equitable relief by imposition of a subrogation lien and constructive trust upon the money presently held or controlled by the defendant law firms in an amount equal to the unreimbursed medical benefits paid by the plaintiffs on behalf of the matched asbestos claimants.  These funds must be held by the defendant law firms for the benefit of the plaintiffs because the subrogation provisions of the health plans require any responsible entity to reimburse the plaintiffs for payments they made on behalf of their plan members, without reduction for any expenses, including attorneys' fees.

34.     Pursuant to 28 U.S.C. §1367, this Court also has supplemental jurisdiction over the plaintiffs' FEHBA-related claims because those claims are so related to the plaintiffs' other claims that they form part of the same case or controversy under Article III of the United States Constitution.

35.     Jurisdiction is also proper under 42 U.S.C. § 1395y(b)(3)(A).

36.     Common questions of law and fact with respect to each of these claims will arise in this action.

### IV.    FACTUAL ALLEGATIONS

37.     Thousands of asbestos-related personal injury claims are resolved each year. While some claims are resolved in the tort system, most are resolved through claims submitted to asbestos trusts.

38.     There is very little information publicly available concerning the identities of asbestos claimants who submit and/or resolve their asbestos-related claims through asbestos trusts.  In fact, it is not possible through reasonable diligence to identify more than a fraction of the claimants who received payments from the asbestos trusts.

39.     First, there is no complete, publicly available list of asbestos claimants.  Those, lists that do become public (usually through the bankruptcy court process) identify only a fraction of all claimants, and contain only partial identifying information for each claimant.  As a result, it is impossible to identify all claimants with sufficient precision to enable the plaintiffs to match them against the plaintiffs' enrollment records.  These lists can take a variety of forms, each with its own limitations:

- A debtor typically files a Schedule of Assets and Liabilities, which contains a Schedule F that lists all known unsecured claims pending against the debtor at the time it filed for bankruptcy.  Moreover, Schedule F is limited to creditors who asserted claims prior to the date the bankruptcy petition is filed.

- A law firm that represents multiple creditors in a bankruptcy case must file a Rule 2019 Statement identifying the creditors they represent.  However, the exhibits identifying the individual claimants are rarely filed in the public docket.

- A creditor may be required to file a proof of claim to protect its claim, but courts commonly excuse asbestos claimants from this requirement.

- Motion practice may lead to the identification of specific claimants, but this is uncommon, and typically identifies only a small subset of claimants.

40.     Second, the trust claim resolution process has no public disclosure requirement. In fact, asbestos trusts generally agree to maintain all claim submissions and related material as confidential.

41.     For these reasons, the plaintiffs' health plans require members to notify the plaintiffs when they initiate or settle claims against third-party tortfeasors for injuries that the plaintiffs paid to treat.

42.     From 2006 through 2012, asbestos trusts paid out more than $15 billion, resolving hundreds of thousands of asbestos-related claims.  Therefore, because the plaintiffs represent a substantial portion of the United States' population, they should have received tens of thousands of notices from their members or their members' attorneys.  Despite same, however, they have received only a handful.

**A.     Asbestos exposure and related claims led to the creation of asbestos trusts to compensate asbestos claimants, but the process moves slowly and does not protect the plaintiffs' rights.**

43.     Litigation over personal injuries due to asbestos exposure has been ongoing for more than 40 years.  Hundreds of thousands of claims have been filed, and billions of dollars in compensation paid.

44.     More than 100 companies have sought bankruptcy protection as a means of dealing with their asbestos-related liabilities.  In 1994, the Bankruptcy Code was amended to include specific provisions applicable to asbestos-related bankruptcies.  Among the amendments was the addition of § 524(g), which allows the bankruptcy court to issue an injunction (a "524(g) Injunction") channeling most asbestos claims (and future demands) against the debtor and related entities into an asbestos trust.  Once an asbestos trust is established, an individual asbestos claimant must seek recovery from the asbestos trust rather than through a lawsuit against the reorganized debtor, or related entities.

**1.     Asbestos trusts typically pay pre-determined amounts for various asbestos-related diseases, but require releases purporting to waive the trust's liability for medical expenses without the consent of the plaintiffs.**

45.     Asbestos trusts receive, review, process, and pay claims pursuant to the terms of the trust distribution procedures (TDPs) established during the bankruptcy case.  An asbestos claimant is entitled to recover from an asbestos trust only if he or she establishes the existence of

an asbestos-related injury caused by or resulting from exposure to an asbestos-containing product of the debtor(s) whose case led to the creation of that asbestos trust.

46.     The TDPs often require claimants to submit a claim form, typically including, *inter alia*, personal identifying information (name, address, social security number, etc.), proof of a medical diagnosis of one of several specific asbestos-related diseases (medical proof) and proof of significant occupational exposure to an asbestos-containing product manufactured, marketed, sold, or distributed by the debtor(s) (proof of exposure).

47.     The TDPs typically have no specific provision to protect the subrogation and/or reimbursement rights of the plaintiffs prior to authorizing payment to asbestos claimants, although such health plan claims are preserved and are to be processed and paid by the asbestos trust.

48.     A typical TDP contains three avenues for an asbestos claimant to receive compensation – Expedited Review, Independent Review, and Extraordinary Review.

49.     Under Expedited Review, the claimant provides some basic qualifying information relating to his or her medical diagnosis and exposure to asbestos.  Assuming the claimant meets the established threshold, the asbestos trust pays him or her according to a pre-determined compensation formula.  This formula has two main components: (1) a dollar value for each of 7-8 disease types; and (2) a payment percentage applied to that value.  Some representative values of recoveries under Expedited Review are set forth in the chart below (an "*" indicates a trust that is not yet in operation or not yet accepting claims):

| | Scheduled Disease Value | | | | | Claimant's Recovery | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Mesothelioma | Lung Cancer 1 | Other Cancer | Severe Asbestosis | Payment % | Mesothelioma | Lung Cancer 1 | Other Cancer | Severe Asbestosis |
| *WR Grace** | $180,000 | $42,000 | $20,000 | $50,000 | 25% | $45,000 | $10,500 | $5,000 | $12,500 |
| *Pittsburgh Corning** | $175,000 | $47,500 | $27,500 | $47,500 | 37% | $64,750 | $17,575 | $10,175 | $17,575 |
| *ASARCO* | $170,000 | $60,000 | $20,000 | $50,000 | 22% | $37,400 | $13,200 | $4,400 | $11,000 |
| *NARCO* | $75,000 | $18,000 | $9,000 | $18,000 | 100% | $75,000 | $18,000 | $9,000 | $18,000 |
| *THAN* | $150,000 | $65,000 | $30,000 | $60,000 | 30% | $45,000 | $19,500 | $9,000 | $18,000 |
| *Combustion Eng'g.* | $75,000 | $25,000 | $6,000 | $25,000 | 48% | $36,248 | $12,083 | $2,900 | $12,083 |
| *USG* | $155,000 | $45,000 | $15,000 | $30,000 | 20% | $31,000 | $9,000 | $3,000 | $6,000 |

50.     Like its moniker, Independent Review allows for some level of independent review, with the possibility of receiving a higher recovery than that offered under Expedited Review.  Some representative values of recoveries under Independent Review are set forth in the chart below (an "*" indicates a trust that is not yet in operation or not yet accepting claims):

|  | Maximum Disease Value | | | | | Claimant's Maximum Recovery | | | |
|---|---|---|---|---|---|---|---|---|---|
|  | Mesothelioma | Lung Cancer 1 | Other Cancer | Severe Asbestosis | Payment % | Mesothelioma | Lung Cancer 1 | Other Cancer | Severe Asbestosis |
| *WR Grace** | $450,000 | $95,000 | $35,000 | $100,000 | 25% | $112,500 | $23,750 | $8,750 | $25,000 |
| *Pittsburgh Corning** | $500,000 | $100,000 | $100,000 | $100,000 | 37% | $185,000 | $37,000 | $37,000 | $37,000 |
| *ASARCO* | $900,000 | $150,000 | $75,000 | $125,000 | 22% | $198,000 | $33,000 | $16,500 | $27,500 |
| *NARCO* | $1,000,000 | $200,000 | $100,000 | $100,000 | 100% | $1,000,000 | $200,000 | $100,000 | $100,000 |
| *THAN* | $900,000 | $250,000 | $70,000 | $250,000 | 30% | $270,000 | $75,000 | $21,000 | $75,000 |
| *Combustion Eng'g.* | $400,000 | $150,000 | $75,000 | $150,000 | 48% | $193,320 | $72,495 | $36,248 | $72,495 |
| *USG* | $450,000 | $100,000 | $35,000 | $50,000 | 20% | $90,000 | $20,000 | $7,000 | $10,000 |

51.     Extraordinary Review is available for claimants whose asbestos exposure is alleged to be primarily related to the particular debtor whose bankruptcy led to the creation of that asbestos trust.  It also allows for independent review of claims, and carries the possibility of receiving a higher recovery than that offered under Expedited Review or Independent Review, through the use of a "multiplier," typically 3-5 times the Independent Review value.  Some representative values of recoveries under Extraordinary Review are set forth in the chart below (an "*" indicates a trust that is not yet in operation or not yet accepting claims):

| | Maximum Disease Value | | | | | Claimant's Maximum Recovery | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Mesothelioma | Lung Cancer 1 | Other Cancer | Severe Asbestosis | Payment % | Mesothelioma | Lung Cancer 1 | Other Cancer | Severe Asbestosis |
| *WR Grace** | $450,000 | $95,000 | $35,000 | $100,000 | 25% | $112,500 | $23,750 | $8,750 | $25,000 |
| *Pittsburgh Corning** | $500,000 | $100,000 | $100,000 | $100,000 | 37% | $185,000 | $37,000 | $37,000 | $37,000 |
| *ASARCO* | $900,000 | $150,000 | $75,000 | $125,000 | 22% | $198,000 | $33,000 | $16,500 | $27,500 |
| *NARCO* | $1,000,000 | $200,000 | $100,000 | $100,000 | 100% | $1,000,000 | $200,000 | $100,000 | $100,000 |
| *THAN* | $900,000 | $250,000 | $70,000 | $250,000 | 30% | $270,000 | $75,000 | $21,000 | $75,000 |
| *Combustion Eng'g.* | $400,000 | $150,000 | $75,000 | $150,000 | 48% | $193,320 | $72,495 | $36,248 | $72,495 |
| *USG* | $450,000 | $100,000 | $35,000 | $50,000 | 20% | $90,000 | $20,000 | $7,000 | $10,000 |

52.     In addition to the foregoing, to receive a distribution from an asbestos trust, a claimant often must submit a release to the asbestos trust, which purports to release any and all liabilities of the asbestos trust, including those arising from claims for medical expenses.

53.     The plaintiffs have not consented to the release of any of their claims in relation to the matched asbestos claimants.

**2.      The claims handling process may take years.**

54.     While some asbestos trusts process their own claims, they often farm this function out to a third party.  Companies that provide this service to asbestos trusts include Verus Claims Services, LLC (Lawrenceville, NJ), MFR Claims Processing, Inc. (Newtown, PA), Delaware Claims Processing Facility (Naperville, IL), and Claims Resolution Management Company (Falls Church, VA).  These companies possess substantial claimant-specific information for each asbestos trust by which they are retained.

55.     Claims processing typically occurs on a first in, first out basis, with the ordering of claims based on either the date a claim was filed in the tort system or the date on which the claimed disease was diagnosed.  Once processed, a claim is accepted for payment, rejected, or in some cases deferred.

56.     It is not uncommon for an asbestos bankruptcy to take years to resolve.  During the pendency of the bankruptcy, all claims against the debtor (and, in some cases, related entities) are stayed.  Following confirmation of a bankruptcy plan and the establishment of an asbestos trust, asbestos claims can be asserted against the asbestos trust on or after a date specified by the asbestos trust.

57.     Even then, delays plague the payment of approved claims.  For example, to ensure that the asbestos trust has sufficient assets to continue compensating future claimants, resulting in equal treatment of present and future claimants, trust payments are often subject to an

aggregate yearly cap.  Additionally, to ensure that those most severely injured asbestos claimants obtain recovery sooner, many asbestos trusts also require that a certain percentage of the yearly total be paid to malignant claimants.  These requirements result in a backlog of approved but unpaid claims.

58.     It is not uncommon for an asbestos claimant who was injured more than a decade ago, and who may have previously recovered from an earlier asbestos trust, to still be waiting today to receive additional money from a more recently-established asbestos trust.

**B.     The sources and amounts of an asbestos claimant's trust recoveries is a mystery.**

59.     There are presently more than 50 asbestos trusts in operation.  Additional asbestos trusts are scheduled to be established or begin accepting claims within the next 12-18 months.  Collectively, these trusts will hold more than $40 billion in assets.  Information about the operating procedures and activities of these trusts is not readily available, and what little that is available is not in a convenient form.

60.     Third parties have examined the operations of asbestos trusts on a global basis.  The RAND Institute for Civil Justice prepared a 2010 report entitled *Asbestos Bankruptcy Trusts: An Overview of Trust Structure and Activity with Detailed Reports on the Largest Trusts*.  The 2010 RAND report notes that data on important variables, such as the number of claims filed against any asbestos trust, the identity of the individuals filing those claims, and the diseases being claimed and paid, are either incomplete or unavailable.

61.     It is not possible to use trust-level data to determine the number of trusts providing payments to the same individual or the amount the trusts together pay to any one individual claimant.  This lack of information makes it difficult or perhaps impossible to evaluate the asbestos trusts' effect on the total compensation paid to individual claimants.

62.     Despite these limitations, the 2010 RAND report concludes that asbestos trusts paid some $3.3 billion to approximately 575,000 claimants during the year 2008.

63.     Where exposed to or harmed by multiple products or debtors, a single claimant may make multiple filings with numerous asbestos trusts, especially for claims submitted under Expedited Review.   Given the sometimes lengthy period of time between the filing of an asbestos bankruptcy case and the creation of an asbestos trust, a single claimant may obtain multiple asbestos-related recoveries, from multiple sources, over a period of many years.

**C.    The plaintiffs identified matched asbestos claimants for whose recoveries the defendant law firms are liable.**

64.     Notwithstanding these limitations, the plaintiffs have performed substantial due diligence to identify plan members known or suspected to be seeking recovery for asbestos-related injuries.

65.     The plaintiffs have investigated numerous bankruptcy court dockets, identifying and reviewing dozens of publicly-available pleadings and documents.   They have also filed motions in bankruptcy courts, obtaining access to other sources of names, and have searched civil dockets in a variety of courts, both on-line and in-person.   The plaintiffs' ongoing efforts have already resulted in the identification of hundreds of thousands of asbestos claimants.   The defendant law firms represent at least 297 of these.

66.     The plaintiffs have also matched these asbestos claimants against the plaintiffs' internal data, identifying specific asbestos claimants whose asbestos-related medical expenses were, in fact, paid by one or more of the plaintiffs.[1]

---

[1] There are tens, if not hundreds, of thousands of additional plan members whose asbestos-related medical expenses are believed to have been paid for by one or more of the plaintiffs (potential matched asbestos claimants).   The plaintiffs cannot, given the limited available information, definitively 'match' them at this time.   When appropriate, the plaintiffs will identify these additional matched asbestos claimants.

67.    The defendant law firms have resolved the asbestos-related claims of numerous matched asbestos claimants (and, it is believed, many potential matched asbestos claimants) against a variety of entities, receiving funds in settlement or otherwise in compensation for the asbestos-related injuries that the plaintiffs have paid to treat.[2]   Furthermore, the defendant law firms continue to assert and to receive asbestos-related recoveries on behalf of these matched asbestos claimants.

68.    The defendant law firms currently possess and control, and in the past possessed and controlled, specifically identifiable funds that in good conscience belong to the plaintiffs— namely, that portion of each matched asbestos claimant's asbestos recovery that must be set aside and preserved for the benefit of the plaintiffs.  The defendant law firms should not have disbursed and must not be allowed to continue to disburse such money without first protecting the plaintiffs' subrogation and/or reimbursement rights.

69.    The defendant law firms are liable to the plaintiffs for any funds they have already paid out without protecting the plaintiffs' rights, at least to the extent of any fees they deducted from those particular funds.  Those specific funds were the plaintiffs' property, not the asbestos claimant's, and to the extent the defendant law firms retained any portion of those funds, they have been unjustly enriched.

---

[2] It is not uncommon for multiple law firms to represent asbestos claimants jointly with other firms, sharing or splitting the fees associated with any recovery.  The plaintiffs have undertaken a good faith effort to link each matched asbestos claimant to the defendant law firms, but such efforts are hampered by a lack of public disclosure.

70.     There are likely hundreds, if not thousands, of additional plan members represented by the defendant law firms who have recovered or are presently seeking to recover for asbestos-related injuries that the plaintiffs paid to treat.  The plaintiffs reserve their rights to fully protect their valuable subrogation and/or reimbursement claims with respect to all such individuals.

**D.    The plaintiffs have paid to treat the asbestos-related injuries of matched asbestos claimants.**

71.     The plaintiffs have expended millions of dollars to treat the asbestos-related injuries of matched asbestos claimants.

72.     For each matched asbestos claimant, the plaintiffs performed an initial lien determination, generating initial lien amounts which, in the aggregate, are as follows:

| Plaintiff | Number of Matched Asbestos Claimants | Aggregate Initial Lien Amount |
|---|---|---|
| Humana, Inc. | 66 | $3,301,665.58 |
| United HealthCare Services, Inc. | 185 | $10,918,565.50 |
| Aetna, Inc. | <u>46</u> | <u>$5,293,107.63</u> |
| *Total:* | 297 | $19,513,338.71 |

73.     The aggregate initial lien amount represents the amount of medical payments made by the plaintiffs to treat injuries suffered by matched asbestos claimants.[3]

**E.    The plaintiffs are entitled to reimbursement of these funds.**

74.     Plaintiffs generally provided these benefits under agreements and coverage documents that give them: (a) rights of reimbursement from funds recovered by plan members

---

[3] The identities of the specific matched asbestos claimants making up this figure will be provided to the defendant law firms.  The plaintiffs propose that a confidentiality stipulation be entered, ensuring that disclosure of such information be limited.

from tortfeasors to the extent of benefits paid; (b) rights to prompt notice from plan members who initiate suit or recover in settlement or judgment from tortfeasors; (c) subrogation rights against third-party tortfeasors who are responsible for causing the injuries; and (d) other similar rights that are necessary to protect the plaintiffs' ability to enforce their rights.

75.     When the defendant law firms disburse any recovery to a matched asbestos claimant without accounting for the plaintiffs' rights, the plaintiffs' ability to enforce their rights is impaired or extinguished, harming the plaintiffs.

**F.     Medicare Advantage plans have a special right of recovery under federal law requiring reimbursement by primary plans like the tortfeasors.**

76.     Title XVIII of the Social Security Act (the Medicare Act) creates the Medicare program, a system of federally funded health insurance for people 65 and older and people under 65 suffering from certain specified diseases.

77.     The Centers for Medicare and Medicaid Services (CMS) administers Medicare, acting under authority delegated by the Medicare Act to the U.S. Department of Health and Human Services (HHS).

78.     Part A of the Medicare Act, 42 U.S.C. § 1395c, *et seq.*, provides insurance coverage for costs of inpatient hospital and other services.  Part A is available without payment of premiums to most persons who paid Medicare payroll taxes prior to becoming Medicare-eligible.  Part A generally pays 100% of the cost of covered services after deductibles and co-insurance, up to Medicare coverage limits.

79.     Part B of the Medicare Act, 42 U.S.C. § 1395j, *et seq.*, is a voluntary program in which the beneficiary pays premiums to Medicare, and in return Medicare pays the costs of medically-necessary outpatient services, such as doctor's office visits and home health care. Generally, Part B covers 80% of the cost of such services after exhaustion of deductibles.

80.     With limited exceptions, each individual eligible for Medicare is entitled to elect to receive benefits (other than pharmacy benefits) through the original Medicare program under Parts A and B, or through enrollment in a Medicare Advantage plan under Medicare Part C. *See* 42 U.S.C. § 1395w-21(a)(1).  No matter which option beneficiaries choose, Medicare Part A and/or B or Part C, the benefits are Medicare benefits that are governed by Title XVIII and the Medicare regulations promulgated thereunder by CMS.

81.     To qualify as a Medicare Advantage plan, a Medicare Advantage organization (MAO) must meet strict qualifying standards and contract with CMS to provide Medicare benefits to those Medicare beneficiaries who enroll in their plans.  Medicare Advantage plans must provide all Medicare benefits offered under Parts A and B and generally provide additional or "supplemental" benefits.  42 U.S.C. §§ 1395w-21 to 1395v-29.

82.     Pursuant to Title XVIII and CMS Medicare regulations, CMS pays MAOs and delegates to them the obligation to administer, pay, and assume Medicare's economic risk for the Medicare benefits provided to Part C enrollees.

83.     From its inception through 1980, Medicare generally paid for medical services whether or not the recipient was also covered by another health insurance plan.

84.     In 1980, however, Congress enacted the Medicare Secondary Payer statute, 42 U.S.C. § 1395y(b) (MSP), in response to Medicare's skyrocketing costs.

85.     The MSP provides that when Medicare pays for treatment of an enrollee, and there is also a "primary plan," Medicare's payment is conditional; the primary plan, and any entity that receives payment from a primary plan, must reimburse Medicare for the payment it made.

86.     A primary plan's responsibility for such payment "may be demonstrated by . . . a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means." 42 U.S.C. § 1395y(b)(2)(B)(ii).

87.     In the event a primary plan fails to timely reimburse a Medicare payer for its conditional payments made while in the secondary position, the MSP authorizes secondary payers to recover double damages from responsible parties, including the primary plan. 42 U.S.C. §§ 1395y(b)(2)(B)(ii), (b)(3)(A).

88.     A primary plan includes a "liability insurance policy or plan (including a self-insured plan)."  42 U.S.C. § 1395y(b)(2)(A).  A "self-insured plan" includes "a business trade or profession . . . if it carries its own risk (whether by a failure to carry insurance, or otherwise), in whole or in part" for payment of medical expenses.  *Id.*

89.     Self-insured product liability tortfeasors or their liability insurers that pay settlement funds to allegedly injured individuals are primary plans subject to MSP reimbursement obligations.  And, settlement funds paid by such tortfeasors constitute a source from which MAOs may obtain recovery.

90.     CMS and MA plans have the right to maintain an action to recover payments from any entity, including attorneys, that has received a primary payment.  42 C.F.R. § 411.24(g).

91.     CMS pays MAOs from the Medicare Trust Funds.

92.     MSP recoveries by MAOs fulfill the essential purpose of the MSP law: shifting expense from Medicare to primary payers.

93.     When MA plans recover reimbursement or damages from primary plans or other liable parties pursuant to the MSP, such recoveries help reduce Medicare expenditures by the Medicare Trust Funds.

### V.     COUNTS OF THE COMPLAINT

### COUNT I
### Equitable Lien, Constructive Trust, and Equitable Restitution
### (All ERISA Plan Plaintiffs)

94.     The plaintiffs adopt and incorporate all of the preceding paragraphs as is set forth fully herein.

95.     Each ERISA plan plaintiff is an employee welfare benefits plan under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq*.

96.     Each matched asbestos claimant insured by an ERISA plan plaintiff was, at the time of their injury and/or treatment, a "participant" of an ERISA plan within the meaning of § 3(7) of ERISA, 29 U.S.C. § 1002(7); at all material times was eligible to receive, and did receive, benefits under an ERISA plan; and was a beneficiary of that plan within the meaning of § 3(8) of ERISA, 29 U.S.C. § 1002(8).

97.     The ERISA plan plaintiffs have paid medical benefits on behalf of the identified matched asbestos claimants to cover their asbestos-related personal injuries.  The paid benefits were for medical expenses related to injuries the matched asbestos claimants sustained as a result of their exposure to asbestos or asbestos-containing products.

98.     To the extent that any of the matched asbestos claimants (whether such individuals have yet been specifically identified as described above) have been, or will be, compensated for their asbestos-related injuries, the ERISA plan plaintiffs are entitled to subrogation and/or reimbursement.

99.     To the extent that any matched asbestos claimant has not yet been paid, these identifiable funds are in the possession, custody, and control of the tortfeasors against whom the matched asbestos claimants are asserting claims.

100.    Any matched asbestos claimant who previously resolved their claims, whether through verdict, judgment, settlement, asbestos trust payment, or otherwise, received a certain sum of money paid by, or on behalf of the tortfeasor, to, or for the benefit of, the matched asbestos claimant, for the purpose of compensating them for their asbestos-related injuries.

101.    In accordance with governing plan documents, the ERISA plan plaintiffs have an equitable lien/constructive trust over the portion of each asbestos recovery that is owed to the ERISA Plan as reimbursement for paid benefits.

102.    The defendant law firms and the matched asbestos claimants they represent have refused to reimburse the ERISA plan plaintiffs that portion of the asbestos recoveries.

103.    The defendant law firms have, in many cases, already taken their fees for asserting, prosecuting, and/or resolving these asbestos claims out of the asbestos recoveries. After taking their fees from the asbestos recoveries, the defendant law firms disbursed the remaining proceeds to the matched asbestos claimants without accounting for the ERISA plan plaintiffs' rights.

104.    The ERISA plan plaintiffs have an equitable lien/constructive trust over that portion of the fees retained by the defendant law firms equal to the amounts owed to the ERISA plan plaintiffs as reimbursement for paid benefits.

105.    Despite same, the defendant law firms have refused, and continue to refuse, to reimburse the ERISA plan plaintiffs that portion of their fees.

106.   The ERISA plan plaintiffs bring this action pursuant to § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), to enjoin one or more acts and/or practices that violate the terms of the ERISA plans and to obtain appropriate equitable relief, including, but not limited to, a constructive trust and an injunction to enforce certain material provisions of ERISA and redress certain violations of ERISA.

107.   The defendant law firms are also liable to the ERISA plan plaintiffs for equitable restitution in an amount equal to the monies expended by the ERISA plan plaintiffs.

108.   If the funds are disbursed by the defendant law firms to any matched asbestos claimants, the ERISA plan plaintiffs will not have any adequate remedy at law.

### COUNT II
### Private cause of action under 42 U.S.C. § 1395y(b)(3)(A)
### (All MA Plan Plaintiffs)

109.   The plaintiffs adopt and incorporate all of the preceding paragraphs as is set forth fully herein.

110.   The MA plan plaintiffs, and hundreds of other organizations, are certified by CMS as MAOs, as that terms is defined in 42 C.F.R. § 422.2.  MAOs are licensed by states as "risk-bearing entities."

111.   The MA plan plaintiffs are required to comply with the MSP regulations.  Those regulations are designed to ensure that Medicare does not pay, or is timely reimbursed for payments it does make, for medical services that are or could be paid by enrollees' "primary plans."

112.   CMS guidelines mandate that the MA plan plaintiffs use standardized benefit descriptions, documents that CMS calls Evidence of Coverage (EOCs).

113.    EOC's uniformly provide that the MA plan plaintiffs have the right to repayment of conditional payment of Medicare benefits when a primary plan is the primary payer.

114.    Each MA plan plaintiff has made payments of Medicare benefits for items and services required by the matched asbestos claimants as a result of the injuries they suffered due to asbestos exposure.

115.    At the time they made these payments, the MA plan plaintiffs did not know that primary coverage provided by the primary payers existed or that any primary payer could be expected to pay promptly for the matched asbestos claimants' care.  Accordingly, the MA plan plaintiffs' payments were conditional.  *See* 42 C.F.R. § 411.21.

116.    The tortfeasors have not reimbursed the MA plan plaintiffs out of the settlement payments they have made to the matched asbestos claimants.  Further, neither the defendant law firms nor the matched asbestos claimants have resolved or satisfied the MA plan plaintiffs' reimbursement claims.

117.    The MSP law and regulations require all participants in the tort recovery system, including attorneys that have received a primary payment, to honor the reimbursement rights of Medicare and the MA plan plaintiffs.

118.    Upon information and belief, the defendant law firms and settling tortfeasors have satisfied their reimbursement obligations under the MSP law when the law firms' clients were covered under Medicare Parts A and B and ignored identical obligations when their clients were covered by MAOs under Medicare Part C.

119.    Hundreds of matched asbestos claimants are enrolled in MA plans, and millions of dollars have been paid to them in connection with resolving all, or a portion, of their asbestos claims.  In many, if not most, of these instances, the matched asbestos claimants received

asbestos recoveries without disclosing them to or reimbursing the MA plan plaintiff who provided their medical benefits.  By doing so, the matched asbestos claimants, the defendant law firms, and the tortfeasors are cheating the MA plan plaintiffs and gaming the Medicare system in violation of the MSP.

120.    The matched asbestos claimants covered by the MA plan plaintiffs are MA beneficiaries who enrolled in MA plans and on whose behalf the MA plan plaintiffs advanced conditional payments for medical treatment of asbestos-related injuries.

121.    The defendant law firms negotiated settlements with tortfeasors on behalf of the matched asbestos claimants and directly received their asbestos recoveries. These tortfeasors, along with their insurers, are "primary plans" with respect to the settlement payments (including trust payouts) that they have made to the matched asbestos claimants covered by the MA plan plaintiffs.

122.    These asbestos recoveries constitute payments under a primary plan, entitling the MA plan plaintiffs to recover conditional payments made on behalf of each matched asbestos claimant.

123.    Regulations issued by CMS provide that the MA plan plaintiffs, as MAOs, are entitled to exercise the same rights to recover from a primary plan, entity, or individual as those granted to Medicare under subparts B–D of part 411 of 42 CFR.  CMS has interpreted this to mean that the MA plan plaintiffs, as MAOs, have the right (and responsibility) to collect from primary payers using the same procedures that are available to traditional Medicare.

124.    The federal regulations implementing the MSP, *see* 42 C.F.R. § 411.24(g), broadly define the entities from which Medicare and the MA plan plaintiffs, as MAOs, can recover primary payments.  Such recovery may be had from "any entity, including a beneficiary

provider, supplier, physician, attorney, State agency or private insurer that has received a primary payment."

125.    The tortfeasors have made and continue to make such payments to matched asbestos claimants covered by the MA plan plaintiffs.  Tortfeasors make these payments through the defendant law firms in exchange for compromises, waivers, and releases purporting to extinguish the MA plan plaintiffs' claims.

126.    The matched asbestos claimants and the defendant law firms have not reimbursed the MA plan plaintiffs from these asbestos recoveries.

127.    The defendant law firms are required to reimburse the MA plan plaintiffs for outstanding conditional Medicare payments (plus interest) to the extent of any such payments received.

128.    Congress established a private cause of action under 42 U.S.C. § 1395y(b)(3)(A), permitting the recovery of double damages for a failure to make appropriate reimbursement in accordance with the MSP law.

## COUNT III
### Declaratory judgment as to the defendant law firms' obligation to reimburse Medicare benefits
### (All MA Plan Plaintiffs)

129.    The plaintiffs adopt and incorporate all of the preceding paragraphs as is set forth fully herein.

130.    Pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, the MA plan plaintiffs are entitled to a declaration that:

>   (a) the tortfeasors (to the extent they are self-insured), the insurance policies issued to the tortfeasors, and the settlement proceeds paid to the matched asbestos claimants are primary to Medicare, including the Medicare benefits advanced by the MA plan plaintiffs, as MAOs;

(b) when the MA plan plaintiffs, as MAOs, advance conditional Medicare benefits in circumstances where their payments are made secondary pursuant to 42 U.S.C. §§ 1395y(b)(2) and 1395w-22(a)(4), they are entitled to pursue reimbursement from primary plans or entities, including attorneys, that received payments from a primary plan under 42 U.S.C. § 1395y(b)(3)(A);

(c) the defendant law firms, as entities that received payment from a primary plan, are individually obligated to appropriately reimburse the MA plan plaintiffs; and

(d) the defendant law firms may not avoid their obligations under the MSP by claiming that there were no Medicare Part A or B reimbursements owed on behalf of the matched asbestos claimants.

131.     Declaratory relief is necessary and appropriate because the defendant law firms have refused to honor their individual obligations to the MA plan plaintiffs.

## COUNT IV
### Equitable Lien and Constructive Trust
### (All FEHBA Plan Plaintiffs)

132.     The plaintiffs adopt and incorporate all of the preceding paragraphs as is set forth fully herein.

133.     FEHBA contracts have standardized language providing all FEHBA plan plaintiffs with rights of subrogation and reimbursement.

134.     Each FEHBA plan plaintiff insures matched asbestos claimants and has paid medical bills for identified matched asbestos claimants (whether such individuals have yet been specifically identified as described above) to cover their asbestos-related personal injuries.

135.     These matched asbestos claimants are seeking asbestos recoveries.

136.     Pursuant to 5 U.S.C. § 8901, *et seq.*, federal common law, and the plain terms of their contracts with the matched asbestos claimants, the FEHBA plan plaintiffs seek reimbursement of the full amounts of any funds owed to them and/or held in trust by defendant law firms.

137.    If the funds are disbursed from defendant law firms to the matched asbestos claimants, the FEHBA plan plaintiffs will not have any adequate remedy at law.

### COUNT V
### Unjust Enrichment/Money Had and Received
### (All Plaintiffs)

138.    The plaintiffs adopt and incorporate all of the preceding paragraphs as is set forth fully herein.

139.    The defendant law firms have obtained property which rightfully belongs to the plaintiffs, and which was obtained by the defendant law firms under circumstances that would render it wrongful and/or inequitable for the defendant law firms to continue to retain such property.

140.    The property wrongfully obtained by the defendant law firms includes the portion of any asbestos recovery made by a matched asbestos claimant, who was represented by a defendant law firm, which was retained by a defendant law firm, whether as part of a fee agreement or otherwise.  It is that specific property over which the plaintiffs seek the imposition of a constructive trust under this count.

141.    The plaintiffs have no adequate remedy at law against the defendant law firms with respect to this claim, and if no constructive trust is imposed, they may be left without a remedy.

### COUNT VI
### Request for Declaratory Relief
### (All Plaintiffs)

142.    The plaintiffs adopt and incorporate all of the preceding paragraphs as is set forth fully herein.

143.     The plaintiffs are entitled, pursuant to 28 U.S.C. § 2201, *et seq.*, to declaratory relief concerning their rights and other legal relations regarding the funds currently held (or to be sent to), possessed, and/or controlled by the defendants.

144.     Under the express language of the plan documents and applicable federal statutes and regulations, the plaintiffs have liens against funds that covered individuals, such as the matched asbestos claimants, might recover, whether by judgment, settlement, or otherwise, as a result of their exposure to asbestos or any asbestos-containing product(s), whether or not such recovery is designated as payment for medical expenses.

145.     These individual liens, relating to each matched asbestos claimant, are equal to the amount of health insurance benefits that the plaintiffs paid under the plans and/or will pay in the future under the plans in connection with medical treatment of asbestos-related diseases suffered by covered individuals, including the matched asbestos claimants.

146.     The defendant law firms have refused to recognize and/or honor these liens, refused to cooperate with the plaintiffs' reimbursement rights, and refused to provide information reasonably requested by the plaintiffs' to protect their subrogation and/or reimbursement rights.

147.     The defendant law firms have been aware of the existence of these liens for many years, but have refused to acknowledge their validity.

148.     The plaintiffs have a right to declaratory relief declaring, among other things:

(a) the plaintiffs have rights to reimbursement of any funds they paid, or medical benefits that they otherwise furnished, on behalf of any matched asbestos claimant (whether identified to date or in the future);

(b) the asbestos recoveries made by the matched asbestos claimants provide no mechanisms to protect the plaintiffs' rights to reimbursement, and that the process for distributing funds set forth therein will affirmatively impair plaintiffs' rights to reimbursement if payments are distributed to individual matched asbestos claimants;

(c) the extent of each of the plaintiffs' lien rights, if any, in the defendants law firms' assets resulting from the plaintiffs' payment of past medical expenses or other medical benefits provided by the plaintiffs;

(d) the plaintiffs are entitled to disclosure of the names of each individual who is represented by the defendant law firms for the purpose of pursuing an asbestos claim; and

(e) the plaintiffs are entitled to receive payment in satisfaction of their lien rights for medical expenses paid or other medical benefits furnished to any matched asbestos claimant prior to any additional asbestos recovery being disbursed to any matched asbestos claimant or their counsel.

149. The plaintiffs demand a jury trial as to all issues so triable.

## VI.  PRAYER FOR RELIEF

WHEREFORE, the plaintiffs, Humana, Inc., United Healthcare Services, Inc., and Aetna Inc., respectfully request:

(A)  An Order:

(a) imposing a constructive trust in favor of the plaintiffs upon the funds held, possessed and/or controlled by the defendant law firms;

(b) declaring that the plaintiffs are the rightful owners of any asbestos recovery made by a matched asbestos claimant, to the extent necessary to satisfy the plaintiffs' rights of reimbursement or subrogation;

(c) requiring any matched asbestos claimant to execute any and all documents necessary to transfer any proceeds related to any asbestos recovery to the plaintiffs to the extent necessary to satisfy the plaintiffs' rights of reimbursement or subrogation;

(d) enjoining the defendant law firms from transferring or disposing of any assets in any manner that would prejudice, frustrate, or impair the plaintiffs' ability to recover those funds;

(e) granting declaratory relief in the manner set forth above;

(f) awarding judgment against the defendant law firms, and in favor of the plaintiffs;

(g) awarding the MA plan plaintiffs double damages under 42 U.S.C. § 1395y(b)(3)(A);

(h) awarding pre- and post-judgment interest;

      (i) awarding costs and fees in favor of the plaintiffs, against the defendant law firms; and

      (j) granting such other and further relief to which the plaintiffs are entitled under ERISA, Medicare, FEHBA, or otherwise.

(B)    Pursuant to Count V, an Order adjudging, ordering, and decreeing that:

      (a) the plaintiffs' liens are valid and enforceable against any asbestos recovery made by a matched asbestos claimant, whether or not such recovery is designated as a payment for medical expenses;

      (b) the plaintiffs' liens shall be satisfied before any other disbursements are made to, or on behalf of, any matched asbestos claimant, including, but not limited to, nonmedical charges, attorneys' fees, and/or other costs and expenses;

      (c) if any pending asbestos-related claim(s) asserted by any matched asbestos claimant is resolved before this Action is terminated or resolved, the defendant law firms and their agents are enjoined from disbursing any funds awarded or granted to said matched asbestos claimant; and

      (d) the plaintiffs be awarded all such other relief that the Court deems just and fair.

Dated: September 6, 2016      Respectfully submitted,

*/s/ John B. Thomas*
John B. Thomas, *Attorney-in-Charge*
Texas Bar No. 19856150
Southern District Bar No.: 10675
Abbie G. Sprague
Texas Bar No. 24074244
Southern District Bar No.: 1125904
HICKS THOMAS LLP
700 Louisiana Street, Suite 2000
Houston, Texas  77002
Office: 713-547-9106
Fax: 713-547-9150
jthomas@hicks-thomas.com
asprague@hicks-thomas.com

*Counsel for Plaintiffs*

Richard W. Cohen, *pro hac vice pending*
New York Bar No. 55485
Gerald Lawrence, *pro hac vice pending*
Pennsylvania Bar No. 69079
LOWEY DANNENBERG COHEN & HART, PC
Four Tower Bridge
200 Barr Harbor Drive, Suite
West Conshohocken, PA 19428
Tel.: (610) 941-2760
Fax: (610) 862-9777
RCohen@lowey.com
GLawrence@lowey.com

-and-

Mark D. Fischer, *pro hac vice pending*
Kentucky Bar No. 83672
Robert Griffith, *pro hac vice pending*
Illinois Bar No. 6277573
RAWLINGS & ASSOCIATES, PLLC
1 Eden Parkway
LaGrange, KY 40031
Tel: (502) 587-1279
Fax: (502) 584-8580
mdf@rawlingsandassociates.com
rg1@rawlings@associates.com

*Of-Counsel for Plaintiffs*